UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Diane Sahakian,                )
                               )
               Plaintiff,      )
                               )
      v.                       ) No. 2:08-CV-241-PHX-HRH
                               )
Stats ChipPAC, Ltd., et al.,   )
                               )
               Defendants.     )
_____)




DEPOSITION OF GAIL UY

VOLUME 2 (Pages 171 to 212)

Phoenix, Arizona
October 1, 2009
1:05 p.m.






7330 North 16th Street
Suite C-202
Phoenix, Arizona 85020-5275

602.266.6535 Phone
602.266.9661 Fax

Prepared by:
Janet Hauck, RPR
Arizona Certified
Reporter Number 50522

GAIL UY, VOLUME 2 - 10/01/09

```
 1                        I N D E X

 2

 3   WITNESS                                        PAGE

 4   GAIL UY

 5        Examination, Continuing, By Mr. Strojnik:  174

 6

 7                       EXHIBITS

 8   NO.   DESCRIPTION            BATES            PAGE

 9   43    [Proposed] Affidavit  (No Bates)         183
           of Gail Uy
10
     44    Publication entitled, DS 2912-2965       181
11         "Sexual Harassment,
           Workplace Authority,
12         and the Paradoxes of
           Power"
13
     45    Article entitled,     DS 2908-2911       179
14         "Female Managers Face
           More Sexual
15         Harassment"

16

             WITNESS INSTRUCTED NOT TO ANSWER
17
                                    PAGE      LINE
18
                                    184          7
19                                  184         17
                                    184         23
20                                  195          7
                                    195         25
21                                  201         16
                                    201         23
22                                  202         23
                                    203          8
23                                  203         22
                                    204          2
24                                  206         25

25
```

GLENNIE REPORTING SERVICES, L.L.C.

1            DEPOSITION OF GAIL UY

2  was taken on October 1, 2009, commencing at 1:05 p.m.,

3  at the Law Office of Peter Strojnik, P.C., 3030 North

4  Central Avenue, Suite 1401, Phoenix, Arizona, before

5  JANET HAUCK, RPR, a Certified Reporter, Certificate

6  No. 50522, for the State of Arizona.

7

8  APPEARANCES:

9  For the Plaintiff:

10        LAW OFFICE OF PETER STROJNIK, P.C.
          Peter Strojnik
11        Peter K. Strojnik
          3030 North Central Avenue, Suite 1401
12        Phoenix, Arizona  85012

13  For the Defendants:

14        OGLETREE DEAKINS
          Caroline Larsen
15        2415 East Camelback Road, Suite 800
          Phoenix, Arizona  85016

16

17

18

19

20

21

22

23

24

25

GLENNIE REPORTING SERVICES, L.L.C.

GAIL UY, VOLUME 2 - 10/01/09                                      174

```
 1                        GAIL UY,
 2   called as a witness herein having been first duly sworn
 3   by the Certified Reporter to tell the whole truth and
 4   nothing but the truth, was examined and testified as
 5   follows:
 6
 7                   EXAMINATION, Continuing
 8
 9   BY MR. STROJNIK:
10        Q.    Ms. Uy, how are you today?
11        A.    Doing good.
12        Q.    Thanks for coming to Phoenix to complete
13   your deposition.  As you know, my name is Peter
14   Strojnik.  I'm the attorney for Ms. Sahakian.  And you
15   are here to complete the deposition that we started in
16   Fremont, I believe it was, on May 27th of this year.
17   Are you ready?
18        A.    Yes.
19        Q.    If you don't understand any question that I
20   put to you, please let me know, because it's very
21   important for me and for the judge and for my client to
22   be certain that you understood a question so the answer
23   you give us is actually the answer that applies to the
24   case and that is truthful, okay?
25        A.    Yes.
```

GLENNIE REPORTING SERVICES, L.L.C.

1         Q.     So, let me get back to an issue we talked

2    about last time that we met, and that question was

3    regarding your understanding of the concept of sexual

4    harassment.  Do you remember we had a discussion about

5    that?

6         A.     Yes.

7         Q.     And I believe that you mentioned to me that

8    you had taken a course in college on sexual harassment,

9    correct?

10        A.     Yes.

11        Q.     I forget what you told me with respect to

12   any continuing education that you've undertaken with

13   respect to sexual harassment.  Have you taken any

14   educational courses since college?

15        A.     I do attend the sexual harassment training

16   every two years for the supervisors.  I also attend a

17   law briefing that is conducted by outside counsel.

18        Q.     Okay.  When was the last time you had a

19   briefing like that?

20        A.     I believe it was last year.

21        Q.     During any of these briefings or meetings or

22   continuing education courses, did you learn that sexual

23   harassment does not necessarily have to be sexual in a

24   physical manner, but it could be of a different manner?

25        A.     It could be.

GAIL UY, VOLUME 2 - 10/01/09

1        Q.    Okay.  So, it doesn't have to be touching or

2   kissing or pushing somebody on somebody else.  It could

3   be of a different kind?

4        A.    It can be.

5        Q.    What different type of sexual harassment can

6   you think of?

7        A.    It can be different things.  For example, if

8   an employee puts up a calendar showing a person that is

9   scantily clad, that could be offensive to another

10  coworker.

11       Q.    What about cases in which the physical

12  appearance of the woman or the victim is not part of

13  the harassment?  Can you think of cases where that's

14  the case?

15             MS. LARSEN:  Objection; form.

16       Q.    BY MR. STROJNIK:  Do you understand my

17  question?

18       A.    Could you repeat your question?

19       Q.    Sure, sure.  I think that we can agree that

20  it's sexual harassment if somebody puts on a picture of

21  a woman that is scantily clad, as you've indicated,

22  because the picture shows a physical attribute of a

23  woman.

24       A.    (No response.)

25       Q.    I think we also agree that if a man makes a

GLENNIE REPORTING SERVICES, L.L.C.

1    pass at a woman or makes comments to the woman about

2    her womanhood or about characteristics of her physical

3    appearance, that would be sexual harassment.  But

4    absent those kind of sexual harassment cases, can you

5    think of any other circumstances that you could

6    consider to be sexual harassment?

7                    MS. LARSEN:  Objection; form.

8                    THE WITNESS:  It depends.

9        Q.    BY MR. STROJNIK:  Well, tell me what it

10    depends on.

11        A.    It depends on the situation.  It depends on

12    the circumstances.

13        Q.    What circumstances and what situation does

14    it depend on?

15        A.    It depends if it is pervasive.  It depends

16    if it's --

17        Q.    If what is pervasive?

18        A.    If the actions are pervasive.

19        Q.    What actions?

20        A.    Sexual harassment actions.

21        Q.    What are the sexual harassment actions?

22    That's what I'm trying to drive at.  What are the

23    sexual harassment actions that might be pervasive but

24    do not relate to the physical attributes of a gender?

25        A.    For example, a calendar that had a person

```
 1    scantily clad.
 2         Q.    That relates to physical attributes of a
 3    person.  I want you to talk about cases where physical
 4    attributes are not a factor.
 5                   MS. LARSEN:  Objection; form.
 6                   THE WITNESS:  I don't know.
 7         Q.    BY MR. STROJNIK:  Let me give you an example.
 8    Perhaps we can talk about it.  Suppose you have a woman,
 9    and suppose you have a group of men who work with that
10    woman and they are constantly demeaning her, not because
11    of the way she looks.  And they don't tell you why they
12    are demeaning her, but they're constantly demeaning her,
13    and they're sniping at her, and they're arguing with
14    her, and they're raising their voices toward her.  Could
15    that be sexual harassment?
16         A.    It depends.
17         Q.    On what?
18         A.    What is being said, what --
19         Q.    What is being said is this:  There is
20    raising of voices toward this person; there's comments
21    made about this person that are negative toward a
22    person; they are pejorative toward a person.  But none
23    of the things that happened have anything to do with
24    the attributes or the physical attributes of the woman.
25    So, I guess my question is:  Could that be sexual
```

```
 1    harassment?

 2                    MS. LARSEN:  Objection; form.

 3                    THE WITNESS:  I don't know.

 4         Q.    BY MR. STROJNIK:  Where would you look to

 5    find out?

 6         A.    If it's sexual harassment?

 7         Q.    Sure.

 8         A.    I'll have to look into what is happening,

 9    investigate, and see if there is sexual harassment

10    there.

11                    (Exhibit No. 45 was marked.)

12         Q.    BY MR. STROJNIK:  Okay.  Let me show you

13    Exhibit Number 45 to your deposition.  And we can just

14    go through it and see if you recognize some of the

15    things in that exhibit as being sexual harassment.

16    First of all, have you ever seen Exhibit Number 45 prior

17    to just this moment?

18         A.    No, I haven't.

19         Q.    Let me also give you another exhibit which

20    is Exhibit Number 44 and ask you if you've ever seen

21    that exhibit before.

22         A.    No, I haven't.

23         Q.    Taking a look at Exhibit Number 44 first --

24    I'm sorry, Exhibit Number -- which one is this one?

25         A.    45.
```

1          Q.    45.   45 first.  This was taken off line.

2    It's entitled, "Female Managers Face More Sexual

3    Harassment."  Do you have some experience in

4    recognizing sexual harassment experienced by female

5    managers?

6          A.    Personal experiences?

7          Q.    Experience in your job with STATS.

8          A.    I'm sorry.  Repeat the question.

9          Q.    Yeah.  Do you have any knowledge or

10   experience with how female managers face more sexual

11   harassment?

12         A.    Not in my position at STATS ChipPAC.

13         Q.    The first subsection of this particular

14   article says, "Power, not sex."  Do you see that right

15   up here?

16         A.    Up here?  "Women in positions of power,"

17   here?

18         Q.    Do you have the same thing I have?

19               PETER K. STROJNIK:  Here.  It's 2910.

20               MR. STROJNIK:  Oh, 2910.

21               PETER K. STROJNIK:  She has the correct

22   copy.  Just flip to page 3, please.

23               THE WITNESS:  Oh, here.

24         Q.    BY MR. STROJNIK:  Oh, okay.  I'm so sorry.

25   On page 3 of Exhibit 45 on the very top there's a

1    notation that says, "Power, not sex."  Have you had any

2    learning in the difference between sexual harassment

3    relating to sex and sexual harassment relating to power?

4                    MS. LARSEN:  Objection; form.

5                    THE WITNESS:  No, I haven't.

6                    (Exhibit No. 44 was marked.)

7         Q.    BY MR. STROJNIK:  If I were to ask you right

8    now, is there a distinction between sexual harassment

9    based on sex and sexual harassment based on power, would

10   you be able to explain it to me?

11        A.    I don't think so.

12        Q.    Okay, fair enough.  Take a look at Exhibit

13   44, please.  I think I asked you if you've ever seen it

14   before.

15        A.    No, I haven't.

16        Q.    Is the documentation that you receive in

17   your job as the human resources manager for STATS, do

18   you receive the type of information that is Exhibit

19   Number 44 from anyone?

20                    MS. LARSEN:  Objection.  Before the

21   witness answers, since she has testified she hasn't seen

22   it before, do you want her to read it?

23                    MR. STROJNIK:  No.  If she can tell me

24   just by looking at it, that would be helpful.  If she

25   can't, I think Exhibit Number 44 I think is probably --

1    let me tell you how many pages it is.  It's about a

2    third of an inch.  So I don't want her to read it now.

3    But if she can answer my question just by looking at it,

4    that would be helpful if she can.

5                      THE WITNESS:  I have to read through it

6    before I could answer the question.

7        Q.    BY MR. STROJNIK:  Do you ever receive

8    documents that are multipage, perhaps 30, 40 page, that

9    deal with issues such as power and sexual harassment?

10       A.    Receive from whom?

11       Q.    From anyone.

12       A.    Outside the company?

13       Q.    Anywhere.

14       A.    I do get some documents from SHRM, which is

15   the Society of Human Resources Management, and some

16   other HR organizations.

17       Q.    Do any of these pieces of information

18   include a description of sexual harassment based on

19   power as compared to sex?

20                      MS. LARSEN:  Objection; foundation.

21                      THE WITNESS:  I don't know.  I can't

22   recall.

23       Q.    BY MR. STROJNIK:  Now, you know that in this

24   case the allegation is made that some of the

25   subordinates of Diane Sahakian were treating her

1    inappropriately; not in a sexual context necessarily,

2    but in a context that made Diane uncomfortable.  Are you

3    aware of those allegations?

4         A.    Yes, I am.

5         Q.    Is it your opinion that these subordinates,

6    such as Eric Gongora, were acting inappropriately

7    toward Diane Sahakian because they were attempting to

8    exercise power over her?

9                    MS. LARSEN:  Objection; foundation.

10                   THE WITNESS:  I don't know.  You'll have

11   to ask Eric.

12                   (Exhibit No. 43 was marked.)

13        Q.    BY MR. STROJNIK:  Well, we have, and we've

14   asked you, and we've asked a number of people, but

15   nobody admits to anything, so that's why I'm asking you

16   again.

17                   You have recently filed an affidavit

18   which is Exhibit Number 43.  Let me just show it to

19   you.  Do you recognize Exhibit Number 43?

20        A.    No, I don't -- oh, hold on.  Let me read it.

21        Q.    Take a look at it more carefully.

22        A.    Yes, I do.

23        Q.    Who prepared this affidavit?

24        A.    Our counsel prepared it, and I reviewed it

25   before I signed it.

GAIL UY, VOLUME 2 - 10/01/09

1    Q.    Did your counsel prepare the affidavit after

2   he talked to you about what the affidavit should say,

3   or did he or she just prepare the affidavit, send it to

4   you, and ask you to sign it?

5                MS. LARSEN:  Objection; calls for

6   attorney-client privileged information.

7                Don't answer that, Gail.

8    Q.    BY MR. STROJNIK:  Do you take your counsel's

9   advice and refuse to answer my question?

10   A.    Yes, I do.

11   Q.    Is Exhibit Number -- what is it, 40 --

12   A.    '3.

13   Q.    43.  Is Exhibit Number 43 the last draft of

14   the affidavit that you signed?

15                MS. LARSEN:  Objection; calls for work

16   product.

17                Don't answer that, Gail.

18   Q.    BY MR. STROJNIK:  Do you refuse to answer my

19   question?

20   A.    Yes, I do.

21   Q.    Are there other draft affidavits which is

22   Exhibit Number 43?

23                MS. LARSEN:  Objection; calls for work

24   product.  Instruct the witness not to answer.

25   Q.    BY MR. STROJNIK:  Do you know what work

```
 1   product is?

 2        A.    No, I don't.

 3        Q.    But you still take your counsel's

 4   recommendation and you refuse to answer my question?

 5        A.    I do.

 6        Q.    Let's take a look at Exhibit Number 43.  In

 7   paragraph 3 you said the following:  You say, "A day or

 8   two after August 7th, 2007, I received a call from

 9   Diane Sahakian ('Sahakian') concerning a telephone

10   discussion that she had with Dr. Han Buyng Joon

11   ('Dr. Han') on August 7th, 2007" -- and this is the

12   important part -- "wherein she discussed the

13   possibility of taking legal action against Dr. Han

14   and/or the company for the company's inquiries into her

15   management style following the receipt of numerous

16   employee complaints."  Do you see that?

17        A.    Yes.

18        Q.    Is this a true statement?

19        A.    Yes.

20        Q.    You've testified today that several days

21   after August 7, 2007, Diane Sahakian discussed with you

22   the possibility of taking legal action against Dr. Han;

23   is that true?

24             MS. LARSEN:   Objection; form; misstates

25   her affidavit.
```

1    Q.    BY MR. STROJNIK:  Did Ms. Sahakian discuss

2    with you the possibility of her taking action against

3    Dr. Han several days after August 7th, 2007?

4              MS. LARSEN:  Objection; form; misstates

5    her affidavit.

6              THE WITNESS:  She told me what she had

7    discussed with Dr. Han.

8    Q.    BY MR. STROJNIK:  In your affidavit you say,

9    "She discussed the possibility of taking legal action

10   against Dr. Han."  You're testifying that this is what

11   she told you?

12             MS. LARSEN:  Objection; form; misstates

13   her affidavit.

14   Q.    BY MR. STROJNIK:  Am I misunderstanding the

15   affidavit?  Do you not say in your affidavit that she

16   told you that she discussed the possibility of taking

17   legal action against Dr. Han?

18   A.    That's what she had told me that she had

19   told Dr. Han on their conversation.

20   Q.    So she told you several days after August 7th

21   that she told Dr. Han that she was considering taking

22   legal action against him; is that your testimony?

23   A.    Yes.

24   Q.    In your previous deposition, this is what

25   you said -- I'm sorry -- this deposition previously

1    taken.  The question was:

2                    "Q.  Did Diane report to you that BJ

3    said to her that she can sue him, or what does this

4    comment mean?"

5                    And your answer was:

6                    "A.  Diane said to me that at one point

7    during their conversation that BJ said to her that you

8    can sue me."

9                    My question to you today is:  Which is

10   true?

11                   MS. LARSEN:  Objection; form.

12                   THE WITNESS:  I don't recall if it was --

13   I do recall having a conversation with Diane when she

14   called me that she had mentioned that she had

15   threatened -- that she had mentioned that she might take

16   action against Dr. Han.

17        Q.    BY MR. STROJNIK:  Let me understand.  You are

18   testifying today that after the conversation between

19   Dr. Han and Ms. Sahakian which occurred on April 7th,

20   that during your conversation with Ms. Sahakian she told

21   you that she might take action against Dr. Han; is that

22   what your testimony is?

23        A.    I can't recall exact facts on there.

24        Q.    Do you think it would be appropriate for you

25   to go to the judge assigned to this case and tell him

1    that your affidavit is not based on your actual memory?

2                    MS. LARSEN:  Objection; form.

3         Q.    BY MR. STROJNIK:  You see, the judge relied

4    on your affidavit in making a decision.  My question is:

5    Now that we know that you don't really remember, do you

6    think it would be appropriate for you to go to the judge

7    and tell him, "You know what, Judge, I don't really

8    remember"?

9                    MS. LARSEN:  Objection; form.

10                    THE WITNESS:  I don't know.

11        Q.    BY MR. STROJNIK:  Is it possible that at the

12   time you talked to Ms. Sahakian that you had already

13   talked to Dr. Han and that it was Dr. Han who told you

14   that she told him that she might sue him?  Is that

15   possible?

16                    MS. LARSEN:  Objection; form.

17                    THE WITNESS:  It could be.

18        Q.    BY MR. STROJNIK:  So would it be fair to say

19   that you could have talked to Dr. Han sometime between

20   April 7th, 2007, but prior to your talking to Diane

21   Sahakian several days later?

22                    MS. LARSEN:  Objection; form.

23                    THE WITNESS:  I did not talk to Dr. Han

24   about any possible suit that --

25        Q.    BY MR. STROJNIK:  I'm sorry.  It was August

Case 5:09-cv-03728-JW    Document 17-3    Filed 10/20/09    Page 19 of 42

1    7th, not April 7.  Does everybody understand it was

2    August 7, not April 7?

3        A.    I thought you said April 7.

4        Q.    Okay.  I made a mistake.  Let me go again.

5    Is it possible that the information that's in this

6    affidavit in paragraph 3 where you say that she

7    discussed the possibility of taking legal action

8    against Dr. Han, is it possible that you received this

9    information from Dr. Han and not from Ms. Sahakian?

10              MS. LARSEN:  Objection; form.

11              THE WITNESS:  I know that Diane had

12    called me prior to me talking to Dr. Han.

13        Q.    BY MR. STROJNIK:  So, it is impossible that

14    you received this information from Dr. Han?

15              MS. LARSEN:  Objection; form.

16              THE WITNESS:  I had received information

17    from Diane before I received it from Dr. Han, because

18    Diane called me before -- Diane called me, and then I

19    had a conversation with Dr. Han after that conversation

20    with Diane Sahakian.

21        Q.    BY MR. STROJNIK:  So, there's no possibility

22    that you could have gotten this information -- and let

23    me just read it to you again -- "that she discussed the

24    possibility of taking legal action against Dr. Han" --

25    there is no possibility that you received this

 1     information from Dr. Han?

 2                     MS. LARSEN:  Objection; form.

 3                     THE WITNESS:  No, because I did talk to

 4     Diane Sahakian before I talked to Dr. Han.

 5          Q.    BY MR. STROJNIK:  That goes to reason,

 6     correct?  You couldn't have gotten it from Dr. Han

 7     because you didn't talk to Dr. Han before you talked to

 8     Ms. Sahakian?

 9          A.    Yes, that's correct.

10          Q.    Okay.  In paragraph 3 you go on and you say

11     that, "The reason why she could take action against

12     Dr. Han was, 'for the company's inquiries into her

13     management style following the receipt of numerous

14     employee complaints.'"

15                     Did Diane Sahakian tell you in her

16     conversation with you after August 7, 2007, that the

17     reason why she could sue Dr. Han was because of the

18     company's inquiries into her management style following

19     the receipt of numerous employee complaints?

20          A.    Yes.

21          Q.    That's what she told you?

22          A.    Yes.

23          Q.    At the time that you spoke with Ms. Sahakian

24     you actually made some handwritten notes.  Do you

25     recall those?

GAIL UY, VOLUME 2 - 10/01/09

1       A.      Yes, I do.

2       Q.      Did you look at those before you came to the

3   deposition today?

4       A.      No.

5       Q.      And in those notes you pretty much wrote

6   down what the conversation was; do you remember that?

7       A.      Yes, I do.

8       Q.      Okay.  Let me just look it up real quick to

9   see if there's anything about that.  Does anybody know

10  what the exhibit number is?  I know what it looks like,

11  but I don't know where it is.  Oh, here we go.  Are

12  these the notes that you took?

13      A.      Yes, it is.

14      Q.      Can you go through your notes -- which are

15  in exhibit number what?

16      A.      29.

17      Q.      -- 29, and show where in there you make

18  reference to the management style following the receipt

19  of numerous employee complaints?

20      A.      The management style investigation, I think

21  it was -- let's see.  It was relating to Scott Gooch at

22  this interview.

23      Q.      Her threat to file a lawsuit was related

24  to --

25      A.      No.

1     Q.    Now, remember, you have to look at your

2  affidavit to put it in context.  You say, "She

3  discussed the possibility of taking legal action

4  against Dr. Han and/or the company for the company's

5  inquiries into her management style following the

6  receipt of numerous employee complaints."

7              I don't find that connection in your

8  handwritten notes.  Perhaps you can point it out to me.

9     A.    Well, the company's inquiries into her

10 management style came about after Scott Gooch's exit

11 interview.

12    Q.    So, how does that relate to the possibility

13 of taking legal action against Dr. Han?

14    A.    She had told me on that conversation that

15 the company should not have done that, and that's

16 somehow again some kind of law she said.

17    Q.    She said that to you?

18    A.    Yes.

19    Q.    Did you write that down?

20    A.    No, I did not.

21    Q.    Now, actually, you did write something down

22 about a lawsuit.  Can you read that into the record?

23    A.    It says, "BJ said she can sue him."

24    Q.    Okay.  So, the fact of the matter is that

25 she did not say that she can sue BJ; she said, "BJ told

1    me I can sue him," correct?

2                    MS. LARSEN:  Objection; form.

3                    THE WITNESS:  That's what she told me.

4        Q.    BY MR. STROJNIK:  I understand.  That's the

5    only information you had at the time, right?

6        A.    Yes.

7        Q.    Because you hadn't talked to BJ yet?

8        A.    No.

9        Q.    After you talked to BJ maybe the information

10   changed.  But at the time that you talked to Diane

11   Sahakian, the only information you had was that BJ told

12   Diane Sahakian that Diane Sahakian can sue BJ, correct?

13       A.    That's what Diane told me.

14       Q.    And that's different than what you say here

15   where you say that she discussed the possibility of

16   taking legal action against Dr. Han.  She discussed

17   what Dr. Han said about that; that's what she

18   discussed, correct?

19       A.    I'm sorry?

20                    MS. LARSEN:  Objection; form.

21       Q.    BY MR. STROJNIK:  She did not discuss the

22   legal possibility of taking action against Han.  She was

23   simply telling you what Dr. Han told her, correct?

24                    MS. LARSEN:  Objection; form.

25                    THE WITNESS:  That's what she said to me.

```
 1        Q.    BY MR. STROJNIK:  Now, but you did say that
 2   you talked to Dr. Han after you talked to Ms. Sahakian;
 3   is that correct?
 4        A.    Yes.
 5        Q.    Did Dr. Han disagree with what Ms. Sahakian
 6   told you several days after August 7th?
 7        A.    With what she told me about --
 8        Q.    About the conversation on August 7th.  Did
 9   he tell you, "No, no, no.  That's not how it happened.
10   This is how it happened"?  Did he say that to you?
11        A.    He told me what he had said.
12        Q.    What did he tell you?
13        A.    What he had said -- I don't recall everything
14   that he had said then, but I think what he said was he
15   had a conversation with Diane, and he mentioned that
16   Diane is threatening to sue him.
17        Q.    Okay.  So it was during your conversation
18   with Dr. Han that Dr. Han told you that Diane told him
19   or was threatening him to sue him, correct?
20              MS. LARSEN:  Objection; form.
21              THE WITNESS:  I think that's what he
22   said.
23        Q.    BY MR. STROJNIK:  When did this conversation
24   take place?
25        A.    It was after I talked to Diane Sahakian.
```

```
 1        Q.    Okay.  What else happened during this

 2   conversation?

 3              MS. LARSEN:  I believe that we're talking

 4   about the same conversation you had with BJ Han and

 5   Janet Taylor; is that correct?

 6              THE WITNESS:  Yes.

 7              MS. LARSEN:  Okay.  Then she's asserting

 8   attorney-client privilege and will not answer those

 9   questions.

10        Q.    BY MR. STROJNIK:  So, the conversation you

11   had with Dr. Han was a three-way conversation.  There

12   was the conversation between you and Janet Taylor and

13   Dr. Han?

14        A.    Yes.

15        Q.    What was the purpose of that conversation?

16              MS. LARSEN:  Objection; calls for

17   attorney-client communication.

18        Q.    BY MR. STROJNIK:  Can you take a look at

19   paragraph 7 where you say the following:  "The sole

20   purpose of our conversation was to decide how the

21   company should respond to Sahakian's threat."  See that?

22        A.    Um-hmm, yes.

23        Q.    So, let me ask you again, what was the

24   purpose of that conversation?

25              MS. LARSEN:  And again, I instruct the
```

```
 1    witness not to answer beyond the scope of her affidavit
 2    for the purposes of attorney-client communications.
 3           Q.    BY MR. STROJNIK:  Is your affidavit correct?
 4           A.    Yes.
 5           Q.    When did this conversation take place?
 6                 MS. LARSEN:  Objection; asked and
 7    answered.
 8                 THE WITNESS:  Are you asking me the exact
 9    dates?
10           Q.    BY MR. STROJNIK:  I want you to be just as
11    accurate as you can.  And you can answer the question in
12    relation to other events or whichever way you want.  I'm
13    not asking for a date.  For example, you can say, "Well,
14    it was on a Saturday.  I was at the zoo with my kids.  I
15    remember that."  Just tell me the best you can as to
16    when this conversation took place.
17           A.    I can't remember the exact date without
18    looking at my notes.
19           Q.    There are some notes with dates?
20           A.    I have the date on my notes here.
21           Q.    Well, you're pointing to Exhibit Number 29.
22    Exhibit Number 29 was filled out a day or two after
23    August 7th.  So did this conversation take place a day
24    or two after August 7th?
25           A.    It could be.  It could be.
```

GAIL UY, VOLUME 2 - 10/01/09

1     Q.     It could be.  Maybe a day or two after,

2  maybe a day after, maybe two days after?

3     A.     I don't recall the exact date.

4     Q.     You say in paragraph 7 that the sole purpose

5  of the conversation was to decide how the company

6  should respond to Sahakian's threat.  Did you know

7  prior to this conversation that there was a threat by

8  Sahakian?

9     A.     Prior to my conversation with Janet Taylor

10 and Dr. Han?

11    Q.     Correct.

12    A.     Yes.

13    Q.     How did you know there was a threat by Diane

14 Sahakian prior to this conversation?

15    A.     Well, based on my discussion with Diane

16 Sahakian when he called me.

17    Q.     Well, in your conversation with Diane

18 Sahakian, she did not tell you that she was threatening

19 anybody.  What she told you was that Dr. Han said to

20 her, "You can sue me."  I don't see the threat in that.

21 Do you see the threat in that?

22              MS. LARSEN:  Objection; form;

23 argumentative.

24              THE WITNESS:  Maybe.

25    Q.     BY MR. STROJNIK:  How do you see a threat in

1    that?

2        A.    Well, when I hear the word "lawsuit," that

3    means that an employee is thinking about taking legal

4    actions against the company.

5        Q.    But your notes, Exhibit Number 29, in your

6    conversation with Ms. Sahakian disclosed that it was

7    not Sahakian who threatened.  It was Dr. Han who

8    mentioned to her that she can sue him.  There's nothing

9    in the notes here that says Ms. Sahakian threatened to

10   sue; is there?

11       A.    No.

12       Q.    And she didn't tell you that she intended to

13   sue; did she?  Because you would have written it down

14   here on Exhibit Number 29 if she did, correct?

15               MS. LARSEN:  Objection; form.

16               THE WITNESS:  I don't know.  I don't know

17   if I would have written it down.  Maybe I was in a rush

18   to write it down.  I don't remember.

19       Q.    BY MR. STROJNIK:  Okay.  But what we do know

20   is that you were aware that there was a threat by

21   Ms. Sahakian.  You were aware of that fact prior to your

22   conversation with Janet Taylor and Dr. Han; am I correct

23   so far?

24       A.    Yes.

25       Q.    Okay.  We also know that Ms. Sahakian did

```
 1    not threaten anything during her conversation with you.
 2    We know that; don't we?
 3                    MS. LARSEN:  Objection; form.
 4                    THE WITNESS:  Based on my discussion with
 5    her, she said that -- she mentioned a suit.
 6         Q.   BY MR. STROJNIK:  What she said to you, just
 7    to make absolutely clear, is that Dr. Han said, "You can
 8    sue me"?
 9                    MS. LARSEN:  Objection; form; misstates
10    her testimony.
11                    THE WITNESS:  I think that's what she
12    told me.
13         Q.   BY MR. STROJNIK:  Now, but we also know that
14    Dr. Han told you that she had threatened to sue.
15         A.   Yes.
16         Q.   So, the best I can glean from this, the only
17    place you could have found out that there was a suit by
18    Ms. Sahakian was from Dr. Han?
19                    MS. LARSEN:  Objection; form.
20                    THE WITNESS:  No.  Diane Sahakian had
21    told me on our conversation that she mentioned some kind
22    of suit taking actions against the company.
23         Q.   BY MR. STROJNIK:  What did she say to you?
24    "I'm going to take action against company"?  What did
25    she say to you?
```

1        A.    I can't remember exactly what she said, but

2   to a point where she had mentioned that she may take

3   legal actions against the company.

4        Q.    And you thought that was a threat?

5        A.    Yes.

6        Q.    That's an important piece of information;

7   don't you think?

8        A.    Maybe.

9        Q.    What do you mean, maybe?  It either is or it

10  isn't.

11               MS. LARSEN:  Objection; form.

12               THE WITNESS:  At that time it probably

13  wasn't that important.

14       Q.    BY MR. STROJNIK:  Did you expect to be sued

15  because of what happened to Ms. Sahakian?

16               MS. LARSEN:  Objection; form.

17               THE WITNESS:  I don't know.

18       Q.    BY MR. STROJNIK:  Would it be within your

19  expectations that you would be sued as a result of what

20  happened to Ms. Sahakian?

21               MS. LARSEN:  Objection; form; asked and

22  answered.

23               THE WITNESS:  I don't know.

24       Q.    BY MR. STROJNIK:  Nonetheless, you had a

25  conversation with Janet Taylor and Dr. Han for the

1    express purpose of how to respond to what you call

2    Ms. Sahakian's threat, correct?

3         A.    Yes.

4         Q.    And the threat you refer to is the threat of

5    a lawsuit, correct?

6         A.    Yes.

7         Q.    So, we have three individuals.  We have

8    corporate counsel, Diane Sahakian's manager, and the

9    human resources manager, and they get together to

10   discuss how to respond to a threat of a lawsuit,

11   correct?

12        A.    Yes.

13        Q.    Okay.  Now, how do you know that the sole

14   purpose of the conversation was to decide how to

15   respond to Sahakian's threat?

16             MS. LARSEN:  Objection; calls for

17   attorney-client communication.  I instruct the witness

18   not to answer.

19        Q.    BY MR. STROJNIK:  Is that something that was

20   created in your mind, that, "We better have a

21   conversation so that we can decide how the company

22   should respond to Dr. Sahakian's threat"?

23             MS. LARSEN:  Objection; calls for

24   attorney-client communication.  Instruct the witness not

25   to answer.

1          MR. STROJNIK:  Actually, I'm not asking

2    anything about any attorney-client communication.  I'm

3    asking what was in her mind prior to the conversation.

4          Q.    BY MR. STROJNIK:  Let me ask you again:  In

5    your mind, did you understand that the purpose of the

6    conversation you were about to have with Dr. Han and

7    Janet Taylor was how to respond to Sahakian's threat?

8          A.    Can you repeat your question, please.

9          MR. STROJNIK:  Can you read the question

10   back.

11          (Read back by the reporter.)

12          THE WITNESS:  Yes.

13          Q.    BY MR. STROJNIK:  In your mind, you knew that

14   before the conversation?

15          A.    I had an idea.

16          Q.    Did you have an idea or did you know that

17   this is what was going to be talked about?

18          A.    I only had an idea.

19          Q.    What was the basis for your idea that this

20   is what you were going to talk about?

21          MS. LARSEN:  If the basis of your

22   understanding came from any communication from general

23   counsel, then I would instruct you not to answer.

24          THE WITNESS:  Because all threats of

25   lawsuits have to be disclosed to general counsel.

1          Q.    BY MR. STROJNIK:  Who disclosed this threat

2     of a lawsuit to general counsel?

3          A.    The person who knows about it.

4          Q.    So, that was you?

5          A.    Yes.

6          Q.    So, you called general counsel and said

7     there's a threat of a lawsuit?

8                     MS. LARSEN:  Objection; calls for

9     attorney-client communication.  Instruct the witness not

10    to answer.

11                    MR. STROJNIK:  Can you read the last

12    couple of questions and answers back?  I think that was

13    answered anyway.  If you would, please.

14                    (Read back by the reporter.)

15         Q.    BY MR. STROJNIK:  So, you knew about this

16    threat of a lawsuit a day or two after August 7th, 2007,

17    correct?

18         A.    Yes.

19         Q.    And then you disclosed this threat of a

20    lawsuit to Janet Taylor, correct?

21                    MS. LARSEN:  Objection; calls for

22    attorney-client communications.  Instruct the witness

23    not to answer.

24                    MR. STROJNIK:  Counsel, I don't know if

25    you were here, but she testified that that's what

GAIL UY, VOLUME 2 - 10/01/09

```
1    happened, that that's waived.
2                 MS. LARSEN:  I disagree, and I instruct
3    the witness not to answer.  You just asked her
4    specifically what she told general counsel, and I'm
5    instructing her not to answer that.
6         Q.    BY MR. STROJNIK:  Now, the policy of STATS is
7    to disclose threats of a lawsuit to general counsel,
8    correct?
9         A.    Legal has to know.
10        Q.    Okay, legal has to know.  And is it the
11   policy of STATS to follow instructions given by general
12   counsel?
13                MS. LARSEN:  Objection; foundation.
14                THE WITNESS:  Yes.
15        Q.    BY MR. STROJNIK:  So, we have two policies.
16   Policy Number 1, when lawsuits are a threat legal
17   counsel has to know.  Policy Number 2, we will follow
18   the instructions given by legal department, correct?
19        A.    Yes.
20        Q.    In this case, though, something happened in
21   the meantime.  There was a conversation between you and
22   Dr. Han and Janet Taylor, correct?
23                MS. LARSEN:  Objection; form.
24        Q.    BY MR. STROJNIK:  You told Janet Taylor
25   there's a threat of a lawsuit.  Then there was a
```

```
 1    conversation between you, Dr. Han and Janet Taylor,

 2    correct?

 3                  MS. LARSEN:  Objection; calls for

 4    attorney-client communication.  Instruct the witness not

 5    to answer.

 6                  THE WITNESS:  I can't answer that

 7    question.

 8        Q.    BY MR. STROJNIK:  Was there a conversation

 9    the sole purpose of which was to decide how the company

10    should respond to Sahakian's threat?

11        A.    Yes.

12        Q.    Let's talk about that conversation, okay.

13    Did that conversation take place somewhere in time?

14                  MS. LARSEN:  Objection; form;

15    argumentative.

16        Q.    BY MR. STROJNIK:  Do you understand my

17    question?  Did it happen at a time?

18                  MS. LARSEN:  Objection; form.

19                  THE WITNESS:  Yes.

20        Q.    BY MR. STROJNIK:  Okay.  It happened at a

21    time, because everything happens at a time, right?

22        A.    Yes.

23        Q.    So, first you called Janet Taylor which

24    happened a day or two after August 7th, 2007, correct?

25        A.    Yes.
```

Case 5:09-cv-03728-JW   Document 17-3   Filed 10/20/09   Page 36 of 42

1    Q.    Then there's a conversation between yourself,

2    Dr. Han and Janet Taylor, the sole purpose of which was

3    to decide how the company should respond to Sahakian's

4    threat, correct?

5    A.    Yes.

6    Q.    Okay.  Now, this is where the second policy

7    of STATS comes in.  The policy is that STATS will

8    follow counsel's instructions, correct?

9              MS. LARSEN:  Objection; foundation.

10   Q.    BY MR. STROJNIK:  Correct?

11   A.    Yes.

12   Q.    Okay.  And then we all know that certain

13   things happened to Ms. Sahakian, correct?  Ultimately,

14   she got fired?

15             MS. LARSEN:  Objection; form.

16   Q.    BY MR. STROJNIK:  Correct?

17   A.    Yes, she was terminated.

18   Q.    She was terminated.  She was also put on

19   special projects, correct?

20             MS. LARSEN:  Objection; form.

21             THE WITNESS:  She was, yes.

22   Q.    BY MR. STROJNIK:  Okay.  Now, she was put on

23   special projects because Counsel told you to do that.

24             MS. LARSEN:  Objection; calls for

25   attorney-client communication.  Instruct the witness

```
 1   not to answer.

 2        Q.   BY MR. STROJNIK:  Correct?

 3        A.   Can't answer that question.

 4        Q.   On August 13th, 2007, there was an e-mail

 5   issued by Dr. Han that said something like, "Dear

 6   Leaders:  This is to advise you that Diane Sahakian

 7   will be taken off her current project and she's going

 8   to go into special projects."  Do you recall that

 9   e-mail?

10        A.   I do recall an e-mail coming from Dr. Han,

11   yes.

12        Q.   Was your conversation with Janet Taylor and

13   Dr. Han prior to that e-mail coming out, or subsequent

14   to that e-mail coming out?

15        A.   I can't remember exact dates.

16        Q.   Was there a time that you knew whether the

17   conversation between you and Dr. Han and Janet Taylor

18   took place in relation to the e-mail, or did you not

19   ever know?

20             PETER K. STROJNIK:  There's enough.

21   That's enough.  You got it.

22             THE WITNESS:  I'm sorry.  Do you want me

23   to answer that question?  He interrupted.

24        Q.   BY MR. STROJNIK:  I know.  We have advice

25   from my co-counsel which prompts me to withdraw the
```

GAIL UY, VOLUME 2 - 10/01/09

```
 1    question.
 2                    Do you agree with the following
 3    statement:  Do you agree that women may be subjected to
 4    sexual harassment if they challenge their subordinate
 5    position in the current gender system?
 6                    MS. LARSEN:  Objection; foundation.
 7                    THE WITNESS:  I don't know.
 8        Q.    BY MR. STROJNIK:  Will you agree with the
 9    following statement:  Women supervisors who hold
10    workplace power and authority over male co-workers
11    challenge the natural superiority of men and
12    subordination of women.  Agree with that statement?
13                    MS. LARSEN:  Objection; foundation.
14                    THE WITNESS:  I don't know.
15        Q.    BY MR. STROJNIK:  We're getting very close.
16    Can we go back to Exhibit Number 45.  Can you go to this
17    page.  I think we were looking at it.  Let me ask you if
18    you agree with the following, "Power, not sex."  I'm
19    just going to ask you if you agree with the statements
20    that I'm going to read to you:  Sexual harassment is and
21    always has been about power more than it is about sex.
22    Do you agree with that?
23                    MS. LARSEN:  Objection; foundation; form.
24                    THE WITNESS:  I don't know.  That's her
25    opinion.
```

GAIL UY, VOLUME 2 - 10/01/09

```
 1         Q.    BY MR. STROJNIK:  Do you agree with the
 2    following statement:  What is so difficult and
 3    frightening to women who are in management positions and
 4    have worked hard to get there is that they are suddenly
 5    feeling extremely vulnerable because they find
 6    themselves in a situation which might cost them
 7    everything.  Do you agree with that statement?
 8                   MS. LARSEN:  Objection; form; foundation.
 9                   THE WITNESS:  I don't know.
10         Q.    BY MR. STROJNIK:  Do you agree with following
11    statement:  When female managers are harassed, they
12    often end up caught up in a catch 22 and tend not to
13    report the behavior because of the stigma that could
14    develop, both personal and professional.  Agree with
15    that?
16                   MS. LARSEN:  Objection; form; foundation.
17                   THE WITNESS:  I don't know.
18         Q.    BY MR. STROJNIK:  When women are found in
19    that position, do you agree with the following analysis:
20    If they complain they are seen as complainer, but if
21    they don't do anything about it, they will continue to
22    be harassed.  Do you agree with that statement?
23                   MS. LARSEN:  Objection; form; foundation.
24                   THE WITNESS:  I don't know.
25                   MR. STROJNIK:  Well, thank you very much
```

GAIL UY, VOLUME 2 - 10/01/09

1    for coming down to Phoenix.  I'm actually going to be

2    seven minutes early because I know how important timing

3    is in this case.  So, thank you very much for coming.

4                    MS. LARSEN:  We'll read and sign.

5                    (The deposition adjourned at 1:52 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GAIL UY, VOLUME 2 - 10/01/09

1

### SIGNATURE PAGE

2      I, GAIL UY, a deponent exercising my
right to read and sign my deposition taken on
3  October 1, 2009, place my signature hereon and make the
following changes on this ___ day of _____,
4  2009.

5          (IF THERE ARE NO CHANGES, WRITE "NONE.")

6

                _____
7                      GAIL UY

8  PAGE    LINE    READS              CHANGE TO          REASON

9  _____   _____   _____    _____    _____

10 _____   _____   _____    _____    _____

11 _____   _____   _____    _____    _____

12 _____   _____   _____    _____    _____

13 _____   _____   _____    _____    _____

14 _____   _____   _____    _____    _____

15 _____   _____   _____    _____    _____

16 _____   _____   _____    _____    _____

17 _____   _____   _____    _____    _____

18 _____   _____   _____    _____    _____

19 _____   _____   _____    _____    _____

20 _____   _____   _____    _____    _____

21 _____   _____   _____    _____    _____

22 _____   _____   _____    _____    _____

23 _____   _____   _____    _____    _____

24 _____   _____   _____    _____    _____

25 _____   _____   _____    _____    _____

GAIL UY, VOLUME 2 - 10/01/09

```
 1    STATE OF ARIZONA     )
                           )
 2    COUNTY OF MARICOPA   )

 3

 4              I, JANET HAUCK, a Certified Reporter,

 5    Certificate No. 50522, in the State of Arizona, do

 6    hereby certify that the foregoing witness was duly

 7    sworn to tell the whole truth; that the foregoing pages

 8    constitute a full, true, and accurate transcript of all

 9    proceedings had in the foregoing matter, all done to

10    the best of my skill and ability.  Pursuant to request,

11    notification was provided that the deposition is

12    available for review and signature.

13

14              I FURTHER CERTIFY that I am not related

15    to nor employed by any of the parties hereto, and have

16    no interest in the outcome hereof.

17

18              WITNESS my hand this 15th day of

19    October, 2009.

20

21

22              _____
                Janet Hauck, RPR
23              Arizona Certified
                Reporter No. 50522

24

25
```